Citation Nr: 1528201 
Decision Date: 06/30/15 Archive Date: 07/09/15

DOCKET NO. 97-17 063A ) DATE
 )
 )

Received from the
Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas


THE ISSUES

1. Entitlement to service connection for a disability due to central nervous system ischemic changes.

2. Entitlement to an effective date earlier than February 1, 1996 for the grant of service connection for coronary artery disease (CAD).

3. Entitlement to a rating in excess of 30 percent for coronary artery disease from February 1, 1996, and in excess of 60 percent from December 19, 2014.


REPRESENTATION

Appellant represented by: Disabled American Veterans


ATTORNEY FOR THE BOARD

Suzie Gaston, Counsel

INTRODUCTION

The Veteran had active service from September 1963 to January 1996. 

This matter comes before the Board of Veterans' Appeals Board on appeal from August 1996, October 2006, and April 2011 RO rating decisions. The August 1996 rating decision of the Denver, Colorado RO, in pertinent part denied service connection for a heart disorder listed as chest pain, sinus bradycardia, an abnormal electrocardiogram, and elevated cholesterol levels and for a disability manifested by central nervous system ischemic changes listed as central nervous system ischemic changes. The case was later transferred to the Waco, Texas, Regional Office RO. 

In August 2006, the Board, in part, remanded the issues of entitlement to service connection for a heart disease and service connection for a disability manifested by central nervous system ischemic changes. 

In November 2008, the Board denied the Veteran's claims for entitlement to service connection for a heart disorder and a disability manifested by central nervous system ischemic changes. The Veteran appealed to the United States Court of Appeals for Veterans Claims (Court). In March 2010, the Court granted a joint motion to vacate and remand the Board's decision. In October 2010, the Board remanded the claims of entitlement to service connection for a heart disorder and a disability manifested by central nervous system ischemic changes for further evidentiary development. 

In April 2011, the originating agency granted service connection for coronary artery disease, rated as noncompensably disabling, effective February 1, 1996, and granted service connection for hypertension, rated as noncompensably disabling, effective December 11 2003. The Veteran's appeal was returned to the Board in September 2011. The Board again remanded the issue of entitlement to service connection for a disability manifested by central nervous system ischemic changes. 

In February 2012, the agency of original jurisdiction (AOJ) increased the rating for the Veteran's service-connected coronary artery disease to 10 percent, effective January 23, 2006. In June 2012, a statement of the case was issued that essentially addressed the issues of entitlement to an initial higher compensable rating for coronary artery disease for the period from February 1, 1996 to January 22, 2006, and entitlement to an initial rating higher than 10 percent for the period since January 23, 2006. The Veteran perfected the appeal. See 38 C F R §§ 20.200, 20.202, 20.302 (2014). 

In August 2012, the Board remanded the issues of entitlement to an initial higher compensable rating for a coronary artery disease and entitlement to an initial higher compensable) rating for hypertension. In October 2012, the RO, in pertinent part granted a 30 percent rating for the coronary artery disease, effective February 1, 1996, and granted a 10 percent rating for hypertension effective December 11, 2003. In April 2013, a statement of the case was issued that, in pertinent part, addressed the issue of entitlement to a higher rating for hypertension. However, the record does not reflect that a timely substantive appeal was submitted as to that issue. See 38 C F R §§ 20 200, 20202, 20 302 (2014). 

In June 2014, the Board remanded the claim of service connection for central nervous system ischemic changes, the claim for a higher initial rating for coronary artery disease, and the claim for an earlier effective date for coronary artery disease. By a February 2015 decision, the AOJ awarded a 60 percent rating for coronary artery disease, effective from December 19, 2014. Consequently, this rating issue now involves two stages as reflected on the title page, supra.


FINDINGS OF FACT

1. The Veteran is presumed to have been exposed to herbicides while on active duty in Vietnam. 

2. Other than migraines (which are already service connected), the Veteran does not have a disability due to central nervous system ischemic changes. 

3. The Veteran's date of separation from active military service was January 31, 1996. 

4. The Veteran's initial claim of service connection for a heart disability was received on February 13, 1996. 

5. Service connection for coronary artery disease (CAD) was granted effective February 1, 1996, the day following the Veteran's separation from military service. 

6. From the February 1, 1996 effective date of service connection to January 12, 1998, CAD was manifest by no more than chest pains; occlusion or thrombosis, or a history of substantiated repeated angina attacks was not shown. 
 
7. From January 12, 1998 to December 19, 2014, the Veteran's coronary artery disease was not shown to be manifested by more than one episode of acute congestive heart failure in a year; workload of greater than 3 metabolic equivalents (METs) but not greater than 5 METs that results in dyspnea, fatigue, angina, dizziness, or syncope; or left ventricular dysfunction with an ejection fraction of 30 to 50 percent; occlusion or thrombosis, or history of repeated angina attacks was not shown. 

8. For the period beginning December 19, 2014, the Veteran's coronary artery disease is not shown to be manifested by chronic congestive heart failure; a workload of 3 METs or less resulting in dyspnea, fatigue, angina, dizziness, or syncope; or left ventricular dysfunction with an ejection fraction of less than 30 percent; more than sedentary employment is not precluded. 


CONCLUSIONS OF LAW

1. A disability manifested by central nervous system ischemic changes was not incurred in or aggravated by active service and may not be presumed to have been incurred therein. 38 U.S.C.A. §§ 1101, 1112, 1131, 1137, 5103A, 5103, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309 (2014). 

2. The criteria for assignment of an effective date prior to February 1, 1996, for the grant of service connection for coronary artery disease (CAD) have not been met. 38 U.S.C.A. §§ 5107, 5110 (West 2014); 38 C.F.R. § 3.400 (2014). 

3. For the period prior to December 19, 2014, the criteria for the assignment of a disability rating in excess of 30 percent for coronary artery disease have not been met. 38 U.S.C.A. §§ 1155, 5103A, 5103, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.7, 4.104, Diagnostic Code 7005 (1997); 38 C.F.R. § 4.104, Diagnostic Code 7005 (2014). 

4. For the period beginning December 19, 2014, the criteria for the assignment of a disability rating in excess of 60 percent for coronary artery disease have not been met. 38 U.S.C.A. §§ 1155, 5103A, 5103, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.7, 4.104, Diagnostic Code 7005 (1997); 38 C.F.R. § 4.104, Diagnostic Code 7005 (2014). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duty to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) enhanced VA's duty to notify and assist claimants in substantiating their claims for VA benefits, as codified in pertinent part at 38 U.S.C.A. §§ 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159 , 3.326(a) (2014). 

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant of the information and evidence not of record that is necessary to substantiate the claim; and to indicate which information and evidence VA will obtain and which information and evidence the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b). The United States Court of Appeals for Veterans Claims has held that VCAA notice should be provided to a claimant before the initial RO decision on a claim. Pelegrini v. Principi, 18 Vet. App. 112 (2004). However, if VCAA notice is provided after the initial decision, such a timing error can be cured by subsequent readjudication of the claim, as in a statement of the case (SOC) or supplemental SOC (SSOC). Mayfield v. Nicholson, 20 Vet. App. 537, 543 (2006); Prickett v. Nicholson, 20 Vet. App. 370, 376 (2006). 

While the notice provided to the Veteran in June 2006 was not given prior to the first RO adjudication of the issues on appeal, the notice as provided by the RO prior to the transfer and recertification of the case to the Board complied with the requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b). Additional letters were issued in November 2010, July 2014, September 2014 and December 2014. Those letters informed the Veteran of what evidence was required to substantiate the claims, and of his and VA's respective duties for obtaining evidence. Accordingly, the requirements the Court set out in Pelegrini have been satisfied. 

The Board finds that the content of the above-noted letters provided to the Veteran complied with the requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) regarding VA's duty to notify. 

Regarding the duty to assist, the Veteran was provided an opportunity to submit additional evidence. It also appears that all obtainable evidence identified by the Veteran relative to the claims decided herein has been obtained and associated with the claims file, and that neither he nor his representative has identified any other pertinent evidence not already of record that would need to be obtained for a proper disposition of this appeal. It is therefore the Board's conclusion that the Veteran has been provided with every opportunity to submit evidence and argument in support of his claims, and to respond to VA notice. 

The Board is unaware of any outstanding evidence or information that has not already been requested. The Veteran has been afforded VA examinations on the issues decided herein. McLendon v. Nicholson, 20 Vet. App. 79 (2006). The examinations afforded the Veteran are adequate. Nieves-Rodriguez v. Peake, 22 Vet. App 295 (2008). They were conducted by medical professionals who reviewed the medical records, solicited history from the Veteran, examined the Veteran, and provided a rationale for pertinent conclusions. 

Accordingly, the Board finds that VA has satisfied its duty to notify and assist the Veteran in apprising him as to the evidence needed, and in obtaining evidence pertinent to his claims under the VCAA. Therefore, no useful purpose would be served in remanding the issues decided herein for yet more development. Such a remand would result in unnecessarily imposing additional burdens on VA, with no additional benefit flowing to the Veteran. The Court has held that such remands are to be avoided. Sabonis v. Brown, 6 Vet. App. 426, 430 (1994). 

II. Background

The service treatment reports (STRs) show that the Veteran was seen in an emergency room in September 1983 for complaints of chest pain on and off for several months; he stated that the day before, the pain was severe and radiated to the right arm. Following an examination, the Veteran was given a diagnosis of atypical chest pain for three months. The Veteran was evaluated by Internal medicine. The initial assessment was coronary artery disease. He underwent a Holter monitor and echocardiogram which were normal. The electrocardiogram (ECG) revealed questionable nodal arrhythmia. A September 1994 Medical Board report shows a diagnosis of non-cardiac chest pain, non disqualifying. It was noted that it was highly probable that some of the upper extremity pain was due to the Veteran's cervical nerve root problem. That report also contained a diagnosis of ischemic central nervous system changes. It was noted that evaluations with central nervous system imaging and neurology consultation were performed. An MRI revealed a few areas of nonspecific increased T2 signal intensity in both the temporal lobe and posterior thalamus that was felt to be possibly related to ischemic episodes; however, a caratoid ultrasonography showed no occlusive vascular disease. 

The Veteran's initial claim for compensation for chest pains, sinus bradycardia, possible left atrial enlargement, borderline ECG (VA Form 21-526) was received at the RO on February 13, 1996. 

By a rating action in August 1996, the RO denied the claim of entitlement to service connection for chest pains, sinus bradycardia borderline EKG and elevated cholesterol levels. The RO also denied service connection for central nervous system ischemic changes. 

The Veteran was afforded a heart examination in April 1997. At that time, the Veteran reported that he first noticed a chest discomfort while walking in 1983; he sat down and did not seek any medical attention and a few hours later, the chest discomfort was gone. In January of 1996, he had another similar episode of chest discomfort, accompanied by shortness of breath; he has had three such episodes in the last one year. He stated that the chest discomfort any no relation with physical exertion and activity. When asked if the chest discomfort is aggravated with deep breathing, coughing, movement or is accompanied by tenderness, the patient indicated that he could not recall. The Veteran noted that the discomfort is sometimes felt in the left side of the neck and left arm, up to the elbow. The discomfort generally lasts for three to four hours, and it may occur at any time. On one occasion, when the patient was sleeping, he woke up because of the discomfort. During the chest discomfort, he also feels shortness of breath. He denied shortness of breath otherwise. There is no history of paroxysmal nocturnal dyspnea or orthopnea. At a normal pace on level ground, he is able to walk several blocks without getting chest pain or shortness of breath. There is no history of palpitations and there is no history of blackouts. The patient has not been treated for hypertension. He did not have diabetes and he did not smoke. 

Examination of the heart revealed that the apex beat was inside the midclavicular line. Both heart sounds were normal; no gallops or murmurs were heard. Electrocardiogram revealed sinus rhythm and normal tracing; a chest x-ray, dated April 3, 1997, revealed normal heart size and clear lung fields. The pertinent diagnosis was chest pain, atypical for angina. It appeared to be of non-cardiac origin. The thallium scan was normal. Echocardiogram revealed mild mitral regurgitation; otherwise, left ventricular function was normal. The examiner stated that, in view of these findings, it appeared that the patient's chest pain was not due to myocardial ischemia. And, in view of the mitral regurgitation, he would recommend SBE prophylaxis if the patient considered undergoing any surgical intervention. The examiner noted that mitral regurgitation does not warrant any treatment at the present time. 

The Veteran was afforded a VA examination in April 1997. At that time, the Veteran stated that an MRI of his head, performed in December 1993, revealed possible ischemic episodes involving the brain; it was noted that the MRI was done because he was having the recurrent headaches. The Veteran indicated that he continued to have recurrent migraine headaches, associated with episodes of blurred vision. An April 1997 computed tomography (CT) scan of the head revealed that intracerebral vascular structures exhibited no abnormalities. Following an examination, the VA examiner stated that central nervous system ischemia was not found at present. The neurologic examination was unremarkable. 

Received in October 1997 was a medical certificate dated in July 1997, indicating that the Veteran was seen and evaluated for complaints of atypical chest pain. 

By letter dated in October 1997, the Veteran was informed that his Agent Orange registry examination revealed findings of follicular thyroid cancer, degenerative joint and disc disease of the lumbar spine, and hypertriglyceridemia. 

Received in April 1998 were VA treatment reports dated from April 1997 to July 1997, which show that the Veteran received clinical evaluation, including diagnostic testing for his heart disease. A baseline electrocardiography performed in May 1997 was negative; there were no electrocardiographic changes suggestive of ischemia. A CT scan of the head, dated in July 1997, was reported to be normal. Among these records was an addendum to the April 1997 heart examination, dated in May 1997, indicating that the thallium scan was normal; an echocardiogram revealed mild mitral regurgitation, otherwise, left ventricular function was normal. The examiner stated that, in view of those findings, it appeared that the Veteran's chest pain was not due to myocardial ischemia. And, in view of the mitral regurgitation, he would recommend SBE prophylaxis if the Veteran would consider undergoing any surgical intervention. The examiner noted that mitral regurgitation did not warrant any treatment at the present time. 

Medical evidence of record, VA as well as private treatment reports, dated from June 1999 through May 2005, reflect ongoing treatment for a chronic low back disorder and disabilities involving the lower extremities as well as other disabilities unrelated to the appeal. The Veteran received treatment for hydronephrosis. These records do not reflect any complaints or treatment for heart disease or central nervous system ischemic changes. 

The Veteran was afforded a VA examination in October 2006. At that time, he indicated that he started having problems with chest pain when he was on active duty in 1983; he recalled walking in a shopping mall and he started noticing some severe sharp pain in the left side of his chest with associated tightness. The Veteran described the pain as sharp, lasting for a few minutes, followed by a feeling of being very weak and fatigued. He noted that he had to sit down until the pain resolved. The Veteran stated that he never reported the episode of chest pain to the military physician or reported to any emergency room until 2 years later when he started noticing the chest pain again. At that time, he did report this to the military physician and an EKG and cardiac evaluation were done which were within normal limits. The Veteran stated during the rest of his military career he had on and off chest pain but he never reported this to the military physician because he wanted to continue to be in flight status; if he complained of chest pian, he would have been removed from flight status. The Veteran stated that, since then, the condition of his heart has been the same. The Veteran stated that a stress test was done 1 year ago with adenosine testing and this testing was borderline positive with conflicting findings on this adenosine stress test. The symptoms related to chest pain were still present at least once a month and usually this pain lasted for 2-3 minutes and was associated basically to the left side of his chest. 

The Veteran denied having any history of smoking. He had a history of hypercholesterolemia since 1997. He denied having any history of heart attacks or any family history of heart attacks; even so, the Veteran stated that recently an EKG done in 2003 showed he had possible old inferior infarct that was confirmed with another EKG in May 2005. Even so, the Veteran was never treated for any heart attacks and it never had been confirmed that he had any coronary artery disease with any cardiac catheterization. He had a study done on his heart with nuclear medicine perfusion study recently but this report was conflicting. The physician who did the report did not know whether there was any patchy abnormality on his heart that he thinks that could be related to artifact or could be related to any perfusion abnormality, so he did not know exactly what he had. 

The Veteran stated that when he was on active duty in 1973-1974, he was complaining of severe migraine headaches with associated visual disturbances and even some loss of vision in certain segments most classic of scotoma. The Veteran stated that he was referred by the military physician to a neurologist and according to him he did a CT scan of his brain and he had some ischemic changes on his brain. The Veteran stated that because of that probably he had these ischemic changes but basically the Veteran stated that in 1994 when he was in active duty he did have an episode of severe TIAB apparently some neurological changes that according to the Veteran he was evaluated for then and he was told that it was TIA but never confirmed that he had any stroke. The Veteran stated that about 2 years ago he had a severe episode of vertigo that lasted for about 6-8 hours and was so severe that even it was associated with nausea and vomiting and he had to crawl to the phone to look for help. The Veteran stated that after that episode of severe vertigo of 6-8 hours this was resolved very spontaneously. The Veteran noted that, presently, the only symptom related to this condition included headaches that happen at least 2-3 times a month and usually are not very severe. 

The Veteran related that, when he has these headaches usually it is moderate to severe in intensity and usually lasting for 2-3 hours and sometimes can last the rest of the day but it is not associated with any other symptom related to these headaches; he stated that he sometimes had blurry vision related to these headaches but there are no specific triggers for these headaches and relievers include some oxycodone and over-the-counter Excedrin. He was not receiving any medical treatment for this condition. The Veteran reported that the headaches incapacitate him because they slow him down but he is still able to do his home activities and he is still active. These headaches are not postural in nature. Other neurological symptoms related to this included permanent tingling and numbness to his toes and occasionally to his hands that is most likely secondary to his back not due to any stroke. The pertinent diagnoses were coronary artery disease with normal left ventricular ejection fraction found, and asymptomatic lacunar infarcts in the left basal ganglia and capsule. The examiner stated that, after reviewing the Veteran's claims folder extensively, including VA medical records, and taking into account the x-ray reports and the physical examination, it was his medical opinion that the Veteran's heart condition was less likely than not secondary to his military service or that has been present within one year of his military discharge. 

The examiner concluded that the Veteran's present heart condition manifested by coronary artery disease has most likely its origin around year 2003 when he had this evidence of EKG changes. In relation to the ischemic changes of the brain, the examiner opined that the Veteran s present ischemic changes of the brain were less likely than not related or has its origin when he was in active duty. The examiner noted that he based his opinion on the record which contains a CT scan of the brain done in 1997, which was reported to be normal. Therefore, he concluded that the Veteran did not have any ischemic changes in 1997 and these ischemic changes that he has presently are most likely secondary to a recent light stroke that he suffered 3 years ago. According to the veteran 3 years ago he had an episode of severe vertigo nausea and vomiting that most likely caused him to have secondary to this ischemic changes of the brain but not secondary to any ischemic changes when he was on active duty or any residuals of any stroke when he was in active duty. So basically there is enough evidence on his medical records that this Veteran does not have this heart condition or these ischemic changes or any central nervous system abnormalities when he left the military because there is evidence in the records that in 1997 the CT scan of the brain was normal and his nuclear medicine perfusion study was normal with no evidence of any heart condition and no evidence of any neurological conditions. 

Received in November 2010 were VA progress notes dated from August 2007 to October 2010 which show that the Veteran received follow-up evaluation for several disabilities, including heart disease. When seen in March 2010, it was noted that the Veteran was on Aspirin; it was recommended that he take fish oil. 

A VA neurological examination report dated in January 2011 shows that the Veteran s claims file was reviewed by the examiner in conjunction with conducting the examination. The Veteran reported having developed visual difficulty around 1973 to 1974; he noted that he began having migraine headaches about 20 years ago accompanied by floating bodies and a flashing light type of visual disturbance. The Veteran related that around 1973 to 1974, he started having intermittent vision loss dizziness and nausea; however, not all the episodes were associated with a headache, chest pain, palpitations, or shortness of breath. The Veteran related that he would feel general weakness, but no loss of consciousness. There was no associated convulsive activity. There was no associated lateral weakness or numbness. The Veteran indicated that recent episodes started to become stronger and, in the last three to four years, there were more associated with vertigo. He had been given a diagnosis of transient ischemic attacks during service. 

Following a neurological examination in January 2011, the examiner reported that the visual difficulties he describes dates back to more than 20 years ago. The patient has a history of migraine headaches and I am unable to distinguish between if there were any visual disturbances he had due to migraine headaches and the current visual disturbances which could be vascular-related or dysrhythmic activity in the brain-related due to vascular scarring in the brain. The examiner stated that further investigations ordered may help to identify if there are any significant dysrhythmic activity due to vascular scarring in the brain. 

An addendum to the January 2011 VA examination report, dated in June 2011, shows that an electroencephalogram had not shown any dysrhythmic activity, an MRI scan of the brain had not shown any acute mitral cranial hemorrhage midline shift, focal mass, or evidence of major temporal acute cerebral infarction, and a magnetic resonance angiogram had shown normal carotid and vertebrobasilar blood vessels. The examiner explained that the Veteran had a history of migraine headaches dating back to his service; now, the visual disturbance as he described might be representing visual or retinal migraines. The examiner had not found any identifiable structural underlying psychological changes either in the brain or in the circulatory system to the brain which might have been causing symptoms. The Veteran showed no dysrhythmic activity on the electroencephalogram suggestive of any seizure activity. The examiner concluded that the symptoms were more likely than not due to retinal migraine which was associated with migrainous process dating back to his service. The examiner further indicated that the Veteran be evaluated by a retinal specialist to make sure there is no underlying retinal pathology present causing the symptoms. 

Received in July 2012 were VA treatment reports dated January 2011 and February 2011. In January 2011, he was seen for evaluation of substernal chest pain. He underwent a cardiac catheterization, which revealed findings of mild non-obstructive atherosclerotic coronary artery disease in the major epicardial vessels, mild to moderate non-obstructive disease in the diagonal branches. It was noted that the ascending aorta appears dilated; however, this does not appear to affect the aortic root. The report of an echocardiogram, performed in January 2011, noted that the left ventricular systolic function was normal with EF approximately 60 percent, and all cardiac chambers and valves were structurally normal. 

The Veteran was afforded another VA examination in November 2012. After a review of the claims file and previous VA examinations, the examiner noted the following: the June 2011 addendum to the January 2011 VA neurological exam report was read. The neurologist was requesting the retinal exam to rule out any retinal condition that could produce the symptoms that the Veteran was experiencing. The neurologist consulted by phone with the VA ophthalmologist who examined the Veteran that there was no eye condition in the Veteran that would produce the symptoms. There may be neurological conditions that would cause visual dysfunction but not from the eye condition. There was early dry macular degeneration in the left eye which did not cause bilateral intermittent loss dizziness headaches nausea or floating bodies nor does the Veteran relate the symptoms to the left eye at all. The Veterans left macular degeneration is age related and is separate and distinct from the service-connected bilateral epiphora and cephalic migraine headaches. The Veterans left retinal macular degeneration was not incurred or aggravated by service. It is age related only and was not diagnosed until 2006. The December 1993 in service MRI study has absolutely nothing to do with the age-related eye condition. It may have meaning to the neurologists evaluation of the Veteran's condition but it is not a factor in the age-related finding of left retinal drusen. 

On the occasion of a VA examination in December 2014, it was noted the Veteran had a history of hypertriglyceridemia, DM, and hypertension. He reported having chest pain in service, but noted that the work-up was negative. It was also reported that the Veteran had a left heart catheterization on January 14, 2011 which revealed findings of mild nonobstructive athrosclerotic heart disease; he was found to have symptomatic sinus bradycardia in 2014. The Veteran denied syncope or presyncope, angina, or congestive heart failure symptoms. The reported diagnoses were CAD due to hyperlipidemia, age, DM, and hypertension; and, 2nd degree AV block unknown etiology. It was noted that the Veteran's METs level was less than 3-5; the examiner stated that this METs level has been found to be consistent with activities such as light yard work (weeding), mowing lawn (power mower), brisk walking (4 mph). 

It was also reported that the Veteran had a history of chronic headaches; he stated that the symptoms started in the 1970's. The headaches are preceded by unilateral visual field loss, scintillating scotomas, and seeing wavy lines. The Veteran reported experiencing occasional vertigo, nausea and vomiting with the headaches. The headaches that follow are quite severe. He said he did not seek medical attention until much later because he feared losing his pilot/flying priveleges. He reports occurrences of these episodes once every two months on average. These episodes last from a few minutes to several minutes but always less than an hour. He said there were never episodes of complete loss of vision. He denies any focal weakness or sensory deficits on his face or limbs during these episodes. He sustained a head laceration in 1981 but denies worsening of the symptoms. He was diagnosed with acephalgic migraine in 1994. He was found to have ishemic changes in the temporal lobes and thalamus on the MRI done in 1993. He was medically boarded in 1994 with migraine headaches as one of the disqualifying conditions. He had a normal CT scan of the brain in 1997. The repeat brain MRI in 2011 and an EEG that were normal. The Veteran was diagnosed with migraine headaches. The neurological exam as well as recent brain MRI, MRA head and neck, and EEG ruled out CNS condition other than migraines. The condition claimed was at least as likely as not (50% or greater probability) incurred in or caused by the claimed in-service injury, event or illness. The Veteran had symptoms of migraine and migraine equivalent while in service. These symptoms persist. He does not have any other clinical CNS abnormalities other than migraines. The ischemic changes on MRI, a radiological finding, are not causally related to his migraines. Migraines were thought to be due to vasoconstriction and dilation. The ischemic changes were caused by hypertension and diabetes. Anatomically, the ischemic changes in the thalamus and temporal lobes were not part of the visual pathways and therefore do not explain his symptoms. 

The examiner further noted that clinic visits for headaches in 1993 and 1994. There have been no recent clinic visits for migraines in his medical records. He is not on any migraine medication. There is no objective clinical evidence of aggravation. Migraines tend to improve with age. Epiphora is an eye condition and no complaints of epiphora have been found in his recent medical records. There was no mention of ischemic changes in the recent brain MRI therefore, the condition appears to have resolved or at least has not worsened to the point of being detected or diagnosed. 

III. Analysis--Service Connection

An award of service connection is warranted for a disability "resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty." 38 U.S.C.A. §§ 1110, 1131. To establish a right to compensation for a present disability, a Veteran must show: "(1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service"--the so-called "nexus" requirement. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). Holton v. Shinseki, 557 F.3d 1362 (2009). 

In addition, the law provides that, where a Veteran served ninety days or more of active service and organic diseases of the nervous system become manifest to a degree of 10 percent within one year from the date of termination of such service, such disease shall be presumed to have been incurred in service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307, 3.309. While the disease need not be diagnosed within the presumption period, it must be shown, by acceptable lay or medical evidence, that there were characteristic manifestations of the disease to the required degree during that time. Id. 

For a showing of chronic disease in service, there is required a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time, as distinguished from merely isolated findings or a diagnosis including the word "chronic." Continuity of symptomatology is required where the condition noted during service is not, in fact, shown to be chronic or where the diagnosis of chronicity may be legitimately questioned. If the fact of chronicity in service is not adequately supported, then a showing of continuity after discharge is required to support the claim. 38 C.F.R. § 3.303(b) (2014). 

A veteran can attest to factual matters of which he has first-hand knowledge, such as experiencing pain in service, reporting to sick call, being placed on limited duty, and undergoing physical therapy. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). Lay evidence can be competent and sufficient to establish a diagnosis of a condition when (1) a lay person is competent to identify the medical condition (noting that sometimes the lay person will be competent to identify the condition where the condition is simple, for example a broken leg, and sometimes not, for example, a form of cancer), (2) the lay person is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. See Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007). In such cases, the Board is within its province to weigh that testimony and to make a credibility determination as to whether the evidence supports a finding of service incurrence and continuity of symptomatology sufficient to establish service connection. See Barr v. Nicholson, 21. Vet. App. 303 (2007). 

When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the appellant prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

Based on the record, the Board finds that service connection for a disability manifested by central nervous system ischemic changes is not warranted. Significantly, the Board acknowledges that a Medical Board Report showed a diagnosis of ischemic central nervous system changes in September 1994, and an MRI revealed findings that were felt to be related to ischemic episodes, an ultrasonography showed no occlusive vascular disease. In addition, post-service treatment records reflect findings of central nervous system ischemic changes. However, there is no competent evidence demonstrating a relationship between the Veteran's currently diagnosed central nervous system ischemic changes and service. On the contrary, following a VA examination in October 2006, the examiner concluded that the Veteran's present ischemic changes of the brain were less likely than not related or has its origin when he was in active duty. The examiner noted that he based his opinion on the record which contains a CT scan of the brain done in 1997 which was reported to be normal. Therefore, he concluded that the Veteran did not have any ischemic changes in 1997 and these ischemic changes that he has presently are most likely secondary to a recent light stroke that he suffered 3 years ago. More recently, following an examination in December 2014, the examiner stated that the Veteran does not have any other clinical CNS abnormalities other than migraines. The examiner explained that the ischemic changes are caused by hypertension and diabetes. Anatomically, the ischemic changes in the thalamus and temporal lobes are not part of the visual pathways and therefore do not explain his symptoms. These opinions are definitive, based upon a review of the Veteran's entire claims file, and supported by explanation. Accordingly, the opinions are found to carry significant weight. See Prejean v. West, 13 Vet. App. 444, 448-9 (2000). In short, while ischemic changes appear to be due to service-connected hypertension and diabetes, the manifested disability due to those changes is one for which the Veteran is already service connected, namely, migraines. Said another way, the Veteran is service connected for the only disability caused by ischemic changes, so award of service connection for any other CNS change would not be appropriate. Should CNS changes later result in some other disabling condition, consideration of the new disability would then be appropriate.

The Veteran has not provided any medical evidence to support finding that he has a disability manifested by central nervous system ischemic changes, other than migraines, which is related to service. As such, there is no medical evidence of record supportive to the Veteran's claim. The only evidence of record supportive of the Veteran's claim is his own statements. Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), as to the specific issue in this case, an opinion on the etiology of CNS disorder falls outside the realm of common knowledge of a lay person. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007) (lay persons not competent to diagnose cancer); see also Woehlaert v. Nicholson, 21 Vet. App. 456 (2007) (although the claimant is competent in certain situations to provide a diagnosis of a simple condition such as a broken leg or varicose veins, the claimant is not competent to provide evidence as to more complex medical questions). "Competent medical evidence" is evidence that is provided by a person qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. 38 C.F.R. § 3.159(a). In this regard, none of the proffered lay statements indicate that the statement provider had the requisite knowledge of providing a determination of the etiology of his central nervous system ischemic changes. 

For the foregoing reasons, the Board finds that service connection is not warranted for a disability manifested by central nervous system ischemic changes other than migraines. In reaching this determination, the Board acknowledges that VA is statutorily required to resolve reasonable doubt in favor of the Veteran when there is an approximate balance of positive and negative evidence regarding the merits of an issue. That doctrine, however, is not helpful to the Veteran in this case because the preponderance of the evidence is against the claim. 38 U.S.C.A. § 5107(b) (West 2002); see also Ortiz v. Principi, 274 F.3d 1361, 1364, 1365 (Fed. Cir. 2001); Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990). 

IV. Earlier Effective Date

The Veteran claims entitlement to an effective date earlier than February 1, 1996, for a grant of service connection for coronary artery disease. Under 38 U.S.C.A. § 5110(a); 38 C.F.R. § 3.400(b) (2) (i), the effective date of an award of direct service connection shall be the day following separation from active service or date entitlement arose if a claim is received within 1 year after separation from service; otherwise, the effective date of an award of direct service connection shall be either the date of receipt of the claim, or date entitlement arose, whichever is later. A "claim" is defined in the VA regulations as "a formal or informal communication in writing requesting a determination of entitlement, or evidencing a belief in entitlement, to a benefit." 38 C.F.R. § 3.1(p) (2014). An informal claim is "[a]ny communication or action indicating an intent to apply for one or more benefits." 38 C.F.R. § 3.155(a) (2014). 

The evidence of record shows that the Veteran's date of separation from active military service was January 31, 1996. Service connection for coronary artery disease (CAD) has been granted effective February 1, 1996, the day following separation from military service. As such, there is no legal basis on which an effective date earlier than February 1, 1996 can be assigned for service connection for CAD. See 38 U.S.C.A. § 5110(a); 38 C.F.R. § 3.400(b) (2) (i). As the disposition of this claim is based on the law, and not on the facts of the case, the claim must be denied based on a lack of entitlement under the law. Sabonis v. Brown, 6 Vet. App. 426 (1994). 

V. Higher Evaluation for CAD

Disability evaluations are determined by evaluating the extent to which a veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Schedule for Rating Disabilities (rating schedule). 38 U.S.C.A. § 1155 (West 2002 & Supp. 2014); 38 C.F.R. §§ 4.1, 4.2, 4.10 (2014). If two evaluations are potentially applicable, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that evaluation; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2014). 

A disability may require re-evaluation in accordance with changes in a Veteran's condition. It is thus essential, in determining the level of current impairment, that the disability be considered in the context of the entire recorded history. 38 C.F.R. § 4.1. However, where an award of service connection for a disability has been granted and the assignment of an initial evaluation is at issue, separate evaluations can be assigned for separate periods of time based on the facts found. In other words, the evaluations may be "staged." Fenderson v. West, 12 Vet. App. 119, 126 (2001). 

The Veteran's CAD has been evaluated under Diagnostic Code 7005 as 30 percent disabling from February 1, 1996, and 60 percent disabling from December 19, 2014. The Veteran appealed the disability ratings assigned. 

The regulations pertaining to the evaluation of CAD were amended during the pendency of the Veteran's appeal. See 62 Fed. Reg. 65,207 -08 (Dec. 11, 1997); codified at 38 C.F.R. § 4.104, DCs 7000 to 7123; see also 71 Fed. Reg. 52,459 -60 (Sept. 7, 2006); codified at 38 C.F.R. 4.100. The RO has considered the claim under both the old and amended rating criteria and the Veteran has been apprised of both versions of the rating criteria. Taking these factors into consideration, the Board will proceed with consideration of this appeal, applying the version of the criteria which is more favorable to the appellant, if any, subject to applicable effective date limitations. See VA O.G.C. Prec. Op. No. 3-2000 (Apr. 10, 2000), 65 Fed. Reg. 33,421 (2000); see also Kuzma v. Principi, 341 F.3d 1327 
(Fed. Cir. 2003). 

Effective January 12, 1998 (during the time period applicable to this appeal), VA revised the criteria for rating arteriosclerotic heart disease (coronary artery disease). As there is no indication that the revised criteria are intended to have a retroactive effect, the Board has the duty to adjudicate the claim only under the former criteria for any period prior to the effective date of the new criteria, and to consider the revised criteria for the period beginning on the effective date of the new provisions. See Wanner v. Principi, 17 Vet. App. 4, 9 (2003); DeSouza v. Gober, 10 Vet. App. 461, 467 (1997). See also VAOPGCPREC 3- 2000 (2000) and 7-2003 (2003). 

Former Diagnostic Code 7005 (for arteriosclerotic heart disease) provided a 100 percent disability rating during and for 6 months following acute illness from coronary occlusion or thrombosis, with circulatory shock, etc. A 100 percent disability rating was also warranted after 6 months, with chronic residual findings of congestive heart failure or angina on moderate exertion or more than sedentary employment precluded. A 60 percent disability rating was warranted following typical history of acute coronary occlusion or thrombosis, or with history of substantiated repeated angina attacks, more than light manual labor not feasible. A 30 percent disability rating was warranted following typical coronary occlusion or thrombosis, or with history of substantiated angina attack, ordinary manual labor feasible. 38 C.F.R. § 4.104, Diagnostic Code 7005 (1997). 

Effective January 12, 1998, the criteria for rating arteriosclerotic heart disease were amended. Under the current provisions of 38 C.F.R. § 4.104 , DC 7005, arteriosclerotic heart disease characterized by a workload of greater than 7 METs (metabolic equivalent) but not greater than 10 METs which results in dyspnea, fatigue, angina, dizziness, or syncope, or; requires continuous medication, warrants a 10 percent rating. Arteriosclerotic heart disease characterized by a workload of greater than 5 METs but not greater than 7 METs which results in dyspnea, fatigue, angina, dizziness, or syncope, or; with evidence of cardiac hypertrophy or dilatation on electrocardiogram, echocardiogram, or X-ray, warrants a 30 percent rating. Arteriosclerotic heart disease characterized by more than one episode of acute congestive heart failure in the past year, or; a workload of greater than 3 METs but not greater than 5 METs which results in dyspnea, fatigue, angina, dizziness, or syncope, or; left ventricular dysfunction with an ejection fraction of 30 to 50 percent, warrants a 60 percent rating. Arteriosclerotic heart disease characterized by chronic congestive heart failure, or; a workload of 3 METs or less which results in dyspnea, fatigue, angina, dizziness, or syncope, or; left ventricular dysfunction with an ejection fraction of less than 30 percent, warrants a 100 percent rating. 

For rating diseases of the heart, one MET is the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. When the level of METs at which dyspnea, fatigue, angina, dizziness, or syncope develops is required for rating, and a laboratory determination of METs by exercise testing cannot be done for medical reasons, an estimation by a medical examiner of the level of activity (expressed in METs and supported by specific examples, such as slow stair climbing or shoveling snow) that results in dyspnea, fatigue, angina, dizziness, or syncope may be used. 38 C.F.R. § 4.104 , Note 2. 

The Board finds that the Veteran is not entitled to a rating in excess of 30 percent for his service-connected CAD for the period from February 1, 1996 to December 19, 2014. Significantly, the medical evidence of record shows that the Veteran experienced symptoms of chest pain with shortness of breath. In addition, testing revealed findings of mitral regurgitation. An Echocardiogram performed in May 1997 noted mild left ventncular hypertrophy and confirmed mitral regurgitation. Furthermore, a cardiac catheterization in January 2011 noted non-obstructive atherosclerotic coronary artery disease with aortic dilatation. An echocardiography noted an jection fraction of 60 percent. The above clinical findings support a rating of 30 percent under both the old and new criteria. However, the clinical findings prior to December 19, 2014 do not reflect a history of acute coronary occlusion or thrombosis or repeated anginal attacks which preclude more than light manual labor. The competent and credible evidence of record for this period does not show that the Veteran's workload was greater than 3 METs, but less than 5 METs, nor was there evidence of left ventricular dysfunction with an ejection fraction of 30 to 50 percent. Further, although the Veteran underwent cardiac catheterization in January 2011, the evidence of record does not show that the Veteran suffered more than one episode of acute congestive heart failure during any given year during this time period. As such, a rating in excess of 30 percent for CAD is not warranted for the period from February 1, 1996 to December 19, 2014. 

The Board finds that the Veteran is not entitled to a rating in excess of 60 percent for his service-connected CAD for the period from December 19, 2014. The competent and credible evidence of record for this period does not show that the Veteran's workload was less than 3 METs, or left ventricular dysfunction with an ejection fraction of less than 30 percent. Further, as just reviewed, the evidence of record does not show that the Veteran suffered chronic congestive heart failure during this time period. As such, a rating in excess of 60 percent for CAD is not warranted for the period from December 19, 2014. See 38 C.F.R. § 4.104, Diagnostic Code 7005.

In reaching these decisions, the Board considered the doctrine of reasonable doubt, however, where the preponderance of the evidence is against the appellant's claims, the doctrine is not for application. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 


ORDER

Service connection for a disability due to central nervous system ischemic changes is denied. 

An effective date earlier than February 1, 1996, for the grant of service connection for CAD is denied. 

An initial disability rating in excess of 30 percent for coronary artery disease prior to December 19, 2014, is denied. 

A disability rating in excess of 60 percent for coronary artery disease from December 19, 2014 is denied. 



________________________________
MARK F. HALSEY
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs